UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| VERIZON NEW ENGLAND INC. d/b/a VERIZON MAINE,<br><br>Plaintiff<br><br>v.<br><br>MAINE PUBLIC UTILITIES COMMISSION et al.,<br><br>Defendants | Civil No. 05-53-B-C |

Gene Carter, Senior District Judge

### ORDER DENYING PLAINTIFF'S
### MOTION FOR PRELIMINARY INJUNCTION

This case is before the Court on the Motion of the Plaintiff, Verizon New England Inc. d/b/a Verizon Maine, for a Preliminary Injunction. Docket Item No. 28. Plaintiff seeks an order that will enjoin the Public Utilities Commission of Maine (hereinafter "PUC") from enforcing its September 3, 2004, March 17, 2005, and September 13, 2005 Orders in Docket No. 2002-682, or issuing any additional orders, setting or enforcing any rates set by the PUC for any network element not required to be unbundled[1] by the FCC under § 251, but required to be provided under § 271 of the Telecommunications Act, 47 U.S.C. §§ 151 *et seq*., (hereinafter "the Act"). The request for the injunction is based upon the Plaintiff's assertion that Congress gave the Federal Communication

---

[1] The Telecommunications Act requires that certain network elements be unbundled. Those network elements are referred to throughout this Order as "UNEs."

Commission (hereinafter "FCC") exclusive jurisdiction to make all such regulatory determinations under § 271, that the PUC's orders conflict with FCC orders and regulations, and that the PUC's orders thwart federal communications policy, all in violation of the Supremacy Clause of the Constitution of the United States. Plaintiff asserts that the PUC orders are causing it irreparable harm, that the balance of harms favors Plaintiff, and that the loss of benefit to the public supports an order of this Court enjoining enforcement of the PUC's allegedly unlawful orders pending resolution of the present case.

## I. FACTS

### A. FCC Proceedings and Orders

Since 1996 the FCC has issued a series of orders to implement § 251's "impairment" standard for unbundled access to non-proprietary network elements. In 1999 the FCC's UNE Remand Order found that, on a national basis, competitors are impaired in their ability to compete for consumers in the "mass market" (generally residential or small business customers) without unbundled access to selected network elements specified by the FCC. *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996,* Third Report and Order and Fourth Notice of Proposed Rulemaking, CC Docket No. 96-98, 15 FCC Rcd 3696 (1999) (hereinafter "UNE Remand Order"). One month after issuing the UNE Remand Order, the FCC entered a second order, the Line Sharing Order, in which it held that other network elements were also subject to unbundling pursuant to § 251. *Deployment of Wireline Services Offering Advanced Telecommunications Capability and Implementation of Local Competition Provisions of the Telecommunications Act of 1996,* Third Report and Order

in CC Docket No. 98-147 and Fourth Report and Order in CC Docket No. 96-98 (1999) (hereinafter "Line Sharing Order").

On appeal of the UNE Remand Order and the Line Sharing Order, the Court of Appeals for the District of Columbia Circuit vacated the FCC's unbundling findings, concluding that the FCC had failed to apply reasonable limits to the term "impairment" in the Act. *See U.S. Telecom Ass'n v. FCC*, 290 F.3d 415, 427-28 (D.C. Cir. 2002) ("*USTA I*"). After remand of *USTA I*, the FCC issued its Triennial Review Order (hereinafter "TRO"), in which the FCC no longer required unbundled access to certain network elements under § 251. *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers; Implementation of the Local Competition Provisions of the Telecommunications Act of 1996; Deployment of Wireline Services Offering Advanced Telecommunications Capability*, Report and Order and Order on Remand and Further Notice of Proposed Rulemaking, CC Docket Nos. 01-338, 96-98, 98-147, 18 FCC Rcd 16978 (2003) ("TRO"). The FCC also determined, however, that § 271 created unbundling obligations in addition to and independent of § 251. *Id.* ¶ 653. For elements required to be unbundled pursuant to § 271 (hereinafter "§ 271 UNEs"), but not pursuant to § 251 (hereinafter "§ 251 UNEs"), the FCC determined that they must be priced on a "just, reasonable, and not unreasonably discriminatory basis." *Id.* ¶ 656. The TRO was appealed and the Court of Appeals for the District of Columbia Circuit affirmed in part and vacated in part the actions taken by the FCC in the TRO. *U.S. Telecom Ass'n v. FCC* 359 F.3d 554, 651-63 (D.C. Cir. 2004) ("*USTA II*").

In 2005, the FCC issued the TRRO, which further limited the incumbent local exchange carriers (hereinafter "ILECs") § 251 unbundling obligation by no longer

3

requiring selected UNEs pursuant to that section. *Unbundled Access to Network Elements*, Order on Remand, WC Docket No. 04-313; CC Docket No. 01-338, 20 FCC Rcd 2533 (2005) (hereinafter "TRRO"). In addition to delisting certain § 251 UNEs, the TRRO also established a transition plan for the industry.[2] *Id.* ¶¶ 226-228.

After the FCC issued the TRRO, Verizon formally notified competitive local exchange carriers (hereinafter "CLECs") that unbundled access to the UNEs eliminated by the FCC in the TRRO for new customer orders would cease to be available on March 11, 2005, the effective date of that order. Several CLECs objected to Verizon's notice and sought declaratory relief and/or a temporary order from the PUC that Verizon must continue to provide unbundled access to de-listed § 251 UNEs until the parties negotiated and amended their interconnection agreements to conform those agreements to the new federal unbundling rules.

### B. PUC Proceedings and Orders

The Act specifically delegates to state commissions certain responsibilities. For example, relevant to the issues presented in this case, under § 252 of the Act, the PUC is authorized to evaluate and enforce through arbitration Verizon's compliance with Section 251 unbundling, as those unbundling obligations are determined by the FCC. *See* 47 U.S.C. §§ 251(c) and 252. In addition, § 271(d) requires the FCC to "consult" with the PUC to verify a BOC's compliance with § 271(c) competitive checklist items. *See* 47 U.S.C. §§ 271(c) and (d). In March of 2002, Verizon agreed to file a state tariff covering

---

[2] The TRRO permitted competitive local exchange carriers (hereinafter "CLECs") to retain during a transition period continued access to de-listed § 251 UNEs serving end-user customers that existed on the effective date (i.e., the "embedded customer base"). With respect to the embedded base of each of the discontinued § 251 UNEs (*i.e.* UNEs obtained prior to elimination which are used to serve existing end-user customers), the TRRO generally provides a twelve month transition period in which the de-listed § 251 UNEs shall remain available for interconnection by the CLEC at an above-TELRIC rate as established by the FCC and set forth in the FCC's implementing regulations. TRRO ¶¶ 226-228.

4

its unbundling obligations as a condition to the PUC's recommendation to the FCC in that Verizon's § 271 application to provide long distance service in Maine be approved. Based in part on the PUC's recommendation, the FCC approved Verizon's § 271 application to enter the long distance market. *Application by Verizon New England Inc. for Authorization to Provide In-Region, InterLATA Services in Maine*, Memorandum Opinion and Order, CC Docket No. 02-61, 17 FCC Rcd 11659 (2002).  On November 1, 2002, Verizon filed a proposed tariff for review by the PUC that incorporated the terms of Verizon's Section 251 unbundling obligations as they existed on that date.  Verizon's proposed tariff did not include rates for § 271 UNEs.

The tariff was under PUC review (and thus not effective) when the FCC issued its TRO in August 2003, and that tariff apparently remains under review by the PUC at this time.  On October 31, 2003, Verizon submitted modifications to its pending proposed tariff to eliminate rates for those elements of its network to conform its proposed state tariff rates to the FCC's delisting determinations made in the TRO.  In December of 2003, various CLECs opposed Verizon's elimination from the pending tariff elements that the FCC ruled in the TRO were no longer § 251 UNEs, arguing that the PUC had authority to require Verizon to tariff its obligations to continue providing the de-listed § 251 UNEs.

On September 3, 2004, the PUC issued its first order in the Wholesale Tariff Proceeding resolving preliminary legal issues.  *VERIZON MAINE, Proposed Schedules, Terms, Conditions and Rates for Unbundled Network Elements and Interconnection (PUC 20) and Resold Services (PUC 21)*, Order-Part II, Docket No. 2002-682 (Me. P.U.C. Sept. 3, 2004) (Wholesale Tariff Proceeding) (hereinafter "September 2004

5

Order") at 1. The PUC found that Verizon's agreement to file a "wholesale tariff" included all of Verizon's wholesale obligations, both those under § 251 as well as those under § 271 of the Act. *See id.* at 12. The PUC further found that, by agreeing to file such a tariff in Maine, Verizon had consented to the PUC's review of the tariff for compliance with § 271 obligations.[3] *Id*. at 14. The PUC made clear that it was not suggesting that it had authority to define the scope of Verizon's § 271 obligations where the FCC had clearly spoken. *Id*. at 14. Instead, the PUC found that, in light of Verizon's specific commitment to the PUC and the PUC's authority under state law, the PUC had an independent role in determining whether those obligations have been met. *Id*.

With regard to the pricing of Verizon's wholesale offerings, the PUC found that until Verizon submitted and the PUC approved tariffs for § 271 UNEs, Verizon must continue to provide § 271 UNEs at TELRIC rates. To support this requirement, the PUC found it had authority to enforce the FCC's "just and reasonable" pricing standard for § 271 UNEs. *Id*. at 19-20. The PUC adopted the previously-approved TELRIC rates for § 271 UNEs as a temporary measure until Verizon filed a tariff proposing rates which used

---

[3] There is not here any issue as to illegal "subdelegation" of the FCC such as is barred by *USTA II* because here there is no subdelegation in the strict sense of the concept and even if there is, there is no impropriety in it since the FCC, under the PUC orders retain the final decision-making authority over any rate set by the PUC. "A federal agency may turn to an outside entity for advice and policy recommendations, provided the agency makes the final decision itself." *USTA II*, 359 F.3d at 568.

Here, the PUC orders are crafted to leave the final decision on the propriety of any rates it sets to the FCC. The PUC requires Plaintiff to provide § 271 interconnection services at TELRIC rates, "until we, or the Federal Communications Commission (FCC) approve new rates." *VERIZON MAINE, Proposed Schedules, Terms, Conditions and Rates for Unbundled Network Elements and Interconnection (PUC 20) and Resold Services (PUC 21)*, Order, Docket No. 2002-682 (Me. P.U.C. March 17, 2005) (Wholesale Tariff Proceeding) at 1. The PUC order of September 13, 2005 reiterates that Plaintiff's obligations in this regard subsist, "[u]ntil Verizon submits rates for our approval or files FCC-approved rates." *Id*. at 44.

6

the FCC's "just and reasonable" standard under §§ 201 and 202.[4] *Id*. The PUC asserts that this temporary measure was implemented to ensure that Verizon would continue to provide access to those UNEs at just and reasonable rates which, while no longer required under § 251, remained mandatory under § 271. In its September 2004 Order the PUC asserts that the temporary TELRIC prices fall within the range of "just and reasonable" prices even though higher rates might eventually be approved, if and when Verizon undertakes to file for such higher rates. *Id*. at 20. Indeed, the TELRIC prices referenced in the September 2004 Order were the only prices for those specific UNEs which had been reviewed by the PUC and which already met the just and reasonable standard. September 2004 Order at 20 ("We have no record basis to conclude that TELRIC rates do not qualify as "just and reasonable" rates; while we might ultimately approve higher rates, we cannot do so without the benefit of a record or the agreement of the parties.")

In February 2005, after the FCC issued the TRRO further modifying the ILECs' unbundling requirements pursuant to § 251, additional disputes arose between Verizon and the CLECs regarding Verizon's obligations to provide UNEs in Maine and resulted in supplemental filings at the PUC by Verizon and the CLECs. On March 17, 2005, the PUC issued an order denying the CLECs requested relief from the TRRO. Wholesale Tariff Proceeding, Docket No. 2002-682, Order (Me. P.U.C. March 17, 2005) (hereinafter "March 2005 Order"). In addition, in response to certain comments made by Verizon asserting that the PUC's September 2004 Order had no force and that Verizon

---

[4] The PUC had previously adopted specific TELRIC rates for Verizon's § 251 UNEs in Docket No. 1997-505. Investigation Into Total Long Run Incremental Cost (TELRIC) Cost Studies and Pricing for Unbundled Network Elements, Docket No. 1997-505, Order (Feb. 12, 2002) (TELRIC Order).

7

had no obligation to comply with its requirements, the PUC again affirmed Verizon's continuing obligation to comply with both the September 2004 Order and its 2002 commitment to file a wholesale tariff covering both § 251 and § 271 UNEs. *Id.* at 5-7. The PUC noted that more than six months had passed since the PUC had ordered Verizon to submit a tariff covering its § 271 obligations, including prices, but Verizon had yet to take any action. *Id.* at 7. Indeed, Verizon had not sought reconsideration of the September 2004 Order nor had it appealed the Order pursuant to 35-A M.R.S.A. § 1320. *Id.* at 6. Thus, the PUC indicated it would continue to enforce the interim pricing provisions it had put in place in order to ensure the continued availability of § 271 UNEs to Maine CLECs at just and reasonable prices. *Id.* at 6-7.

Finally, on September 13, 2005, the PUC issued an order addressing the current legal status of each of the UNEs appearing on a joint matrix submitted by the parties in September 2004. Wholesale Tariff Proceeding, Docket No. 2002-682, Order (Me. P.U.C. Sept. 13, 2005) (hereinafter "September 2005 Order"). The PUC found that it had "authority to make such determinations, absent an order from the FCC making specific contrary findings, under sections 251, 252 and 271 of the TelAct and under the terms of Verizon's commitment to file a wholesale tariff in our 271 Proceeding." *Id.* at 6. During the course of these proceedings on Verizon's Motion for a Preliminary Injunction, the PUC issued another order amending its previous order to conform with interim rates set by the FCC in the TRRO as to some § 271 UNEs. *VERIZON MAINE, Proposed Schedules, Terms, Conditions and Rates for Unbundled Network Elements and Interconnection (PUC 20) and Resold Services (PUC 21)*, Order-Part I, Docket No. 2002-682 (Me. P.U.C. Nov. 10, 2005).

## II. DISCUSSION

In order to obtain a preliminary injunction, four factors must be met. A party seeking an injunction must show that: (1) it will suffer irreparable injury if the injunction is not granted; (2) such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) it has exhibited a likelihood of success on the merits; and (4) the public interest will not be adversely affected by the granting of an injunction. *See Wine & Spirits Retailers, Inc. v. Rhode Island,* 418 F.3d 36, 46 (1st Cir. 2005); *TEC Eng'g Corp. v. Budget Molders Supply*, 82 F.3d 542, 544 (1st Cir. 1996); *Planned Parenthood League of Massachusetts v. Belloti*, 641 F.2d 1006, 1009 (1st Cir. 1981).

### A. Likelihood of Success on the Merits

The First Circuit has described likelihood of success as "the touchstone of the preliminary injunction inquiry." *Philip Morris v. Harshbarger*, 159 F.3d 670, 674 (1st Cir. 1998). Accordingly, the Court will begin its analysis by considering whether Verizon has demonstrated a likelihood of success on the merits of its claim.

#### 1. Section 271 Rate-Making

This case focuses on the issue of whether the PUC is precluded by the provisions of the Act and the applicable rulings of the FCC from fixing rates under § 271 of the Act. Plaintiff states that in the Act, "Congress gave the Federal Communications Commission…exclusive jurisdiction to establish, interpret, price, and enforce these network access obligations under Section 271." Plaintiff's Motion for Preliminary Injunction at 1. This assertion is overbroad and not supported by the provisions of § 271 of the Act. The central, vital predicate for this argument is that federal law preempts state regulation of § 271 obligations. It is clear that the statute is not intended to have any such

9

effect.  While § 271 states that the approval of an application submitted by a BOC to provide InterLATA services shall be by the FCC, *see* §§ 271(d)(1) and (b)(1), neither that provision nor any other provision in the Act confers exclusive jurisdiction on the FCC with respect to rate-making for § 271 UNEs.  A careful reading of § 271 shows that the language of it contains absolutely no express provision for rates or any comment on authority to make rates.  In fact, the word "rate" does not appear at all in § 271.  There is simply no express consideration of rate-making or rate-making authority set out in § 271.  The section only impliedly contemplates how rates are to be made and that occurs because one of the "competitive checklist" requirements that BOC's must comply with, s*ee* § 271(c)(B)(2) and (ii), is that it provide its services "at just and reasonable" rates, s*ee* §§ 271(b)(ii) and (iii).  Thus, the authority of state commissions over rate-making and its applicable standards is not pre-empted by the express or implied content of § 271.

      Furthermore, Verizon has failed to direct the Court to any order of the FCC interpreting § 271 to provide an exclusive grant of authority for rate-making under § 271.  The only FCC order presented by Verizon that relates to rate-making under § 271 provides "[w]hether a particular checklist element's rate satisfies the just and reasonable pricing standard of section[s] 201 and 202 is a fact-specific inquiry that the [FCC] will undertake."  TRO ¶ 664.  That language says nothing, however, about the *exclusivity* of FCC jurisdiction or about PUC rate-making authority.  Here again, Plaintiff overreaches.  Verizon has failed to present, and this Court has been unable to find, any FCC order specifically interpreting the Act as providing the FCC with exclusive authority to set rates under § 271.

## 2. Use of TELRIC Pricing Under Section 271

The remaining issue is whether the PUC, in the present circumstances of this case, is precluded from imposing TELRIC rates, on an interim basis, by the Act or the orders of the FCC. The PUC argues that the use of TELRIC rates on an interim basis is consistent with the Act and orders of the FCC. As noted above, the Act is silent as to rate-making under § 271 and the only mention of rate-making for § 271 UNEs is found in the FCC's TRO. There, the FCC determined that the Act requires that § 271 UNEs be provided at "just and reasonable" rates. TRO ¶ 656. The PUC asserts that, by definition, TELRIC rates are "just and reasonable," and, thus, the use of TELRIC rates on an interim basis is consistent with the FCC's determination that rates for § 271 UNEs must meet that standard.

Consideration of those provisions of the Act from which TELRIC rates derive is necessary in order to determine whether their use under these circumstances is proper. Section 251 of the Act provides for the regulation of ILECs (which include BOCs) provision of services through interconnection with CLECs. Under §§ 251 and 252 the PUC is delegated the authority to participate in and to ultimately oversee the negotiation, mediation, and arbitration regimen prescribed for the determination of applicable rates for § 251 UNEs subject to the ultimate review of the federal court. There is no language in § 251 that expressly or impliedly contemplates the determination of rates that are to be applicable to the provision of § 271 UNEs. Rates for § 251 UNEs shall be determined by a state commission "based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the interconnection or network element (whichever is applicable), and … [shall be] non-discriminatory, and … may include a

reasonable profit." 47 U.S.C. § 252(d)(1)(A-B).[5] The Act further provides that § 251 UNEs shall be provided by ILECs:

> on rates, terms, and conditions that are *just, reasonable, and nondiscriminatory*, in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title.

47 U.S.C. § 251(c)(2)(D)(emphasis added).[6] It is from these provisions that the TELRIC rate is derived. *See AT &T v. Iowa Utilities* Board, 525 U.S. 366, 384 (1999). Thus, a TELRIC price that conforms to § 251 and § 252 is "just and reasonable."

The FCC has implicitly accepted the PUC's determination that its TELRIC prices are "just and reasonable." In considering Verizon's request to enter the interLATA market pursuant to § 271, the FCC reviewed the PUC's recommendation and its TELRIC methodology to assure that it complied with the Act. *Application by Verizon New England Inc. for Authorization to Provide In-Region, InterLATA Services in Maine*, Memorandum Opinion and Order, CC Docket No. 02-61, 17 FCC Rcd 11659 (2002) at ¶¶ 18-21. The FCC determined that "the Maine Commission followed basic TELRIC principles and that the record does not support a finding that the Maine Commission committed any clear error." *Id.* at ¶ 21. Because the Act requires TELRIC rates to be "just and reasonable," implicit in the FCC's acceptance of the PUC's TELRIC rates is the finding that they are also "just and reasonable." Accordingly, the Court concludes that

---

[5] Only if the state commission fails to act, does the FCC become involved in the determination of the applicable rate. *See* 47 U.S.C. § 252(e)(5). A carrier's objection to the action of the state commission is exclusively limited to review thereof in the "appropriate federal district court to determine whether the agreement or statement meets the requirements of § 251." 47 U.S.C. § 252(e)(6).

[6] Sections 201 and 202 of the Act provide similar requirements. Section 201(a) requires every common carrier engaged in interstate or foreign commerce to provide its services "in accordance with the orders of the [FCC]…[at] charges applicable thereto." 47 U.S.C. § 201(a). Section 202(a) provides that it shall be unlawful for any such carrier, "to make any unjust or unreasonable discrimination in charges …for or in connection with like communication service." 47 U.S.C. § 202(a).

the TELRIC rates prescribed by the PUC for use on an interim basis are "just and reasonable."

Verizon argues, however, that the FCC has gone further than simply prescribing "just and reasonable" as the applicable standard for § 271 UNEs and the FCC has prohibited use of TELRIC rates on UNEs delisted under § 251, but still required under § 271. Thus, Verizon asserts, the PUC's order is invalid due to "conflict preemption." In order to demonstrate conflict preemption, Verizon bears the burden of demonstrating that either "compliance with both state and federal regulations is impossible" or that "state law interposes an obstacle to the achievement of Congress's discernible objectives." *Grant's Dairy-Maine, LLC v. Commissioner of Maine Dept. of Agriculture, Food & Rural Resources*, 232 F.3d 8, 15 (1st Cir. 2000). Verizon contends that the PUC's order conflicts with two FCC orders, which the Court will consider in turn.

Plaintiff asserts that ¶ 473 of the FCC's UNE Remand Order demonstrates that the use of TELRIC rates conflicts with federal law. In that paragraph the FCC states that where a UNE is no longer required under § 251, but is still required under § 271, "it would be counterproductive to mandate that the incumbent offers the element at forward-looking prices [*i.e.* TELRIC]. Rather, the market price should prevail, as opposed to a regulated rate which, at best, is designed to reflect the pricing of a competitive market." UNE Remand Order at ¶ 473. Although Verizon would have this Court read that language as a prohibition against use of TELRIC rates, it does not go that far. Rather, the quoted language demonstrates a preference by the FCC to rely upon rates actually set by the market, as opposed to the TELRIC methodology, which only attempts to estimate that market rate. This is entirely consistent with the PUC's order. The PUC states in its

13

September 2005 Order that TELRIC rates do not apply to § 271 obligations and that only the general "just and reasonable" standard applies to such obligations. September 2005 Order at 10 (citing TRO ¶ 656). Although the PUC makes use of the TELRIC methodology, it is only on an interim basis and its orders make clear that the preferred standard is to be employed once Verizon complies with its tariffing obligations. Accordingly, the Court finds nothing in the cited paragraph which either makes compliance with federal and state regulations impossible, or demonstrates that compliance with the PUC's order will frustrate the purpose of the federal law.

The only other authority cited by Verizon which it contends demonstrates conflict preemption is ¶ 261 of the TRO. That paragraph reads:

> We expressly reject the Commission's earlier finding that "line sharing will level the competitive playing field ...." In fact, rules requiring line sharing may skew competitive LECs' incentives toward providing a broadband-only service to mass market consumers, rather than a voice-only service or, perhaps more importantly, a bundled voice and xDSL service offering. In addition, readopting our linesharing rules on a permanent basis would likely discourage innovative arrangements between voice and data competitive LECs and greater product differentiation between the incumbent LECs' and the competitive LECs' offerings. We find that such results would run counter to the statute's express goal of encouraging competition and innovation in all telecommunications markets.

TRO ¶ 261. From this paragraph Verizon concludes that "continued availability of the UNE at TELRIC rates actually harms competition." Plaintiff's Motion for Preliminary Injunction at 15. Assuming this paragraph's reference to "linesharing rules" should be read to include the imposition of TELRIC rates on linesharing, the Court does not agree with Verizon's conclusion. Although the language in ¶ 261 regarding linesharing borders

14

on demonstrating a conflict with the PUC's orders, after careful scrutiny the Court concludes that it falls short of establishing conflict preemption for several reasons.

First, the Court understands ¶ 261 of the TRO to be a qualified and conditional statement about what would happen if linesharing were required as a § 251 UNE. That is, there is no finding that the use of TELRIC rates for linesharing would in fact interfere with market incentives; rather the TRO states that "rules requiring linesharing *may* skew competitive LEC's incentives." TRO ¶ 261 (emphasis added). The stronger language in ¶ 261 states that "readopting our linesharing rules on a *permanent basis* would likely discourage innovative arrangements between voice and data competitive LECs and greater product differentiation between the incumbent LECs' and the competitive LECs' offerings" and that *if* innovative arrangements were discouraged it would "run counter to the statute's express goal of encouraging competition and innovation in all telecommunications markets." TRO ¶ 261 (emphasis added). Here again, the Court understands this statement to be both qualified and conditioned in such a way as to make it an unreliable basis upon which to conclude that the PUC's action is preempted. The FCC's statement, that applying TELRIC rates on a *permanent basis* could impede the statute's goals, is doubly qualified. This qualified statement regarding the permanent use of TELRIC rates falls short of taking a definitive position on the use of TELRIC rates on an interim basis. How long those rates remain in effect will be largely determined by when Verizon elects to comply with its tariffing obligations. Both of these factors weigh against a conclusion that the PUC's use of TELRIC rates on an interim basis will impede the goals of the statute. Accordingly, the Court concludes that Verizon has failed to establish that the PUC's orders are preempted.

### 3. Verizon Not Likely to Succeed

As a result of the foregoing analysis of the pertinent provisions of the Act and the language of FCC orders relied upon by Verizon, the Court concludes that § 271 is not considered by the FCC and was not intended by the Congress to exclude the PUC in the circumstances of this case from all activity in setting rates under § 271. Moreover, the PUC's use of TELRIC pricing as an interim rate is not precluded by federal law or policy. Accordingly, the Court concludes that the Plaintiff is not likely to succeed on the merits of its claim as articulated in the Motion.

### B. Irreparable Harm[7]

First, Verizon asserts that the PUC order violates its constitutional rights and is, therefore, per se irreparable harm. Although Verizon is correct that in some instances a violation of constitutional rights is sufficient to establish irreparable harm, the constitutional rights Verizon seeks to vindicate here do not rise to such a level. The Supremacy Clause gives priority to federal statutory interests whenever they come into conflict with state law, but does not of its own force create such interests. *See Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 613 (1979); *Dennis v. Higgins*, 498 U.S. 439, 450 (1991); *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107 (1989). Verizon's claim stands in contrast to constitutional claims grounded in substantive rights such as those conferred by the First Amendment in *National People's Action v. Village of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990) and the Eighth Amendment in *Mitchell v.*

---

[7] Because the Court's conclusion that Verizon is not likely to succeed on the merits of its claim, it is not necessary to analyze the other prongs of the preliminary injunctive relief analysis. *See Wine and Spirits Retailers,* 418 F.3d at 46 ( "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity."(quoting *New Comm Wireless Servs., Inc. v. SprintCom, Inc*., 287 F.3d 1, 9 (1st Cir. 2002))). The Court will, however, for purposes of appellate review, consider the other factors in the analysis of Verizon's request for injunctive relief.

*Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984). Consequently, to establish irreparable harm Verizon must do more than assert that the PUC's actions are superseded by those of the FCC and, thus, have constitutional significance.

      Verizon also argues that it has demonstrated irreparable harm because it will suffer "substantial injury that is not accurately measurable or adequately compensable by money" as a result of the PUC order. *See Ross-Simons of Warwick. v. Baccarat,* 102 F.3d at 12, 19 (1st Cir. 1996). As evidence that the harm suffered will be immeasurable, Verizon asserts that the PUC orders do not permit it to negotiate prices with CLECs regarding access to § 271 offerings. Although Verizon alleges that such negotiations "could yield tangible benefits to both sides," there is nothing in this record to support Verizon's allegation that such benefits may be obtained. Plaintiff's Motion for Preliminary Injunction at 17. Even assuming that Verizon could obtain benefits from such negotiations, there is nothing in this record demonstrating that those losses would be "substantial." Additionally, Verizon argues that its harm is incalculable because it will lose market share and customer good will to CLECs who can provide access to Verizon's network at "discounted" TELRIC prices. Here too, Verizon fails to offer any evidence that such harm may result from the PUC's order or that such harm would be substantial.

      Verizon finally argues that its harm is irreparable because it cannot recover damages[8] from either the State or CLECs. While Verizon is probably correct that it would be unable to recoup lost revenue from the State, it remains unclear whether

---

[8] The Court notes that the only "damages" at issue are those that Verizon alleges will be suffered by charging the rates imposed by the PUC. Although Verizon also faces the possibility of fines for failure to comply with the PUC's order, those fines, even if imposed, cannot be properly considered as damages arising from the PUC's order. Those damages, if suffered, will be caused by Verizon's decision not to comply with the PUC's order. *See San Francisco Real Estate v. Real Estate Invest. Trust of America*, 692 F.2d 814, 818 (1st Cir. 1982).

Verizon would be able to recoup such losses from CLECs.  It is not known whether either the FCC or the PUC would permit Verizon to recoup any losses it may claim to have suffered as a result of the application of TELRIC pricing to § 271 UNEs.  Even Verizon in its brief characterizes this issue as "not entirely free from doubt."  Plaintiff's Motion for Preliminary Injunction at 18.  Therefore, Verizon has failed to meet its burden of demonstrating that it will suffer irreparable harm.

### C. Balance of the Harms

Verizon contends that the balance of the hardships weighs heavily in favor of granting a preliminary injunction because if Verizon does not ultimately prevail it could be ordered to repay in full, through credits to CLECs, all incremental revenues it has collected during the pendency of this litigation over and above the rates imposed by the PUC, whereas it cannot recover damages from the State or CLECs.  Even assuming that Verizon is correct in its assertion that the CLECs would be able to recover any overcharges from Verizon but that Verizon could not recover any overcharges from the CLECs, the Court is not persuaded that such losses would be so great as to place the balance of the hardships heavily in Verizon's favor because Verizon's delay in seeking injunctive relief casts doubt on Verizon's assertion that the financial harm that it may suffer is substantial.  *See Charlesbank Equity Fund II v. Blinds to Go*, 370 F.3d 151, 163 (1st Cir. 2004) ("The longer the delay, the more pervasive the doubt.").

It has been over one year since the PUC notified Verizon that in the absence of a filed tariff, the rate to be charged for § 271 UNEs would be TELRIC and, although this lawsuit was filed in April 2005, Verizon did not seek preliminary injunctive relief from this Court until September 22, 2005 – one year after the imposition of default TELRIC

prices on § 271 UNEs. Verizon claims, however, that this delay should be excused because it was not until the September 2005 Order that it knew what elements would be required under § 271. Plaintiff's Reply Memorandum in Support of Motion for Preliminary Injunction at 4. Although it is true that Verizon was not aware until the September 2005 PUC Order of all the UNEs which it would be required to provide under § 271 because they were in dispute, there were at least several UNEs which Verizon did not dispute were required under § 271. *See* September 2005 Order at 30 (Noting, for example, Verizon's agreement that "switching" and "signaling and call-related data bases" are required as § 271 UNEs.). Therefore, Verizon knew that it would be required to provide some UNEs at TELRIC prices in September 2004. Since then, Verizon has been aware of the potential harm and capable of seeking relief from it. Verizon is a sizeable and sophisticated company with the ability to protect its interests and its corporate/litigation strategy has permitted this situation to persist unresolved. Verizon's considerable delay in seeking injunctive relief raises doubt as to Verizon's claim that it will suffer irreparable harm of great magnitude absent equitable relief from this Court. Therefore, the Court does not find that the balance of the harms weighs in favor of granting Verizon preliminary injunctive relief.

### D. Public Interest

Verizon contends that the public interest supports an injunction at this time because the PUC's orders conflict with federal law and, therefore, are contrary to the public interest. The PUC responds that the imposition of a preliminary injunction will bear most heavily on the CLECs and their customers because the CLECs would be deprived access to network elements at just and reasonable prices upon which its

customers depend.  The overarching public interest in this case is that the public be provided with a competitive telecommunications market in Maine and, specifically, that the § 271 UNEs be provided in a competitive market environment at a "just and reasonable" rate.  There is nothing in the record from which the Court can conclude that the application of TELRIC pricing for § 271 UNEs runs counter to providing a competitive market.  The public interest prong, therefore, weighs in favor of denying Verizon's request for injunctive relief.

### III. CONCLUSION

Accordingly, the Court **ORDERS** that Plaintiff's Motion for Preliminary Injunction be, and it is hereby, **DENIED.**

/s/ Gene Carter
Gene Carter
Senior United States District Judge

Dated this 30th day of November, 2005.